Andrew M. Calamari
Sanjay Wadhwa
Alexander Vasilescu
Lara S. Mehraban
Jorge G. Tenreiro
New York Regional Office
SECURITIES AND EXCHANGE COMMISSION
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-9145 (Tenreiro)
Attorneys for the Plaintiff



14 CV 6933

JUDGE BUCHWALD

RECEIVED
AUG 2 6 2014
U.S.D.C. S.D. N.Y.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                       Plaintiff,

         -against-

MICHAEL ANTHONY DUPRE LUCARELLI,

                       Defendant.

---

**COMPLAINT**

**ECF CASE**

      Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint

against defendant Michael Anthony Dupre Lucarelli ("Lucarelli"), alleges as follows:

## SUMMARY

      1.     This case involves multiple instances of insider trading carried out by

Lucarelli, who was at the time a Director of Market Intelligence at an investor relations

firm ("IR Firm A").

      2.     From at least August 2013 and continuing through at least August 2014

(the "relevant time period"), Lucarelli traded in advance of over twenty corporate event

1

announcements by at least thirteen clients of IR Firm A, reaping illicit profits of over
$950,000.

3.   Upon information and belief, Lucarelli obtained access to material,
nonpublic information in advance of these announcements through his work at IR Firm
A, and, despite clear IR Firm A policies prohibiting trades on clients' material nonpublic
information—by which policies Lucarelli explicitly agreed to abide—breached his duty
to his employer and/or its clients by using this information to purchase and sell securities
related to those clients in his personal accounts.

4.   Lucarelli's scheme followed a simple but consistent pattern:  Lucarelli
would purchase or sell the securities of, and/or options contracts associated with the
securities of, a particular client of IR Firm A in the days or weeks before that client made
a material corporate announcement to investors.  IR Firm A had material nonpublic
information from these clients as IR Firm A personnel provided investor relations
services in connection with each of these announcements.  Following the release of the
announcements, Lucarelli exited his position in the securities issued by, or related to, the
issuer/client, sometimes within hours of the relevant announcement.  Thus Lucarelli
swiftly profited from the material nonpublic information based upon which he traded.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

5.   The Commission brings this action pursuant to the authority conferred
upon it by Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C.
§ 77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15
U.S.C. § 78u(d)].  The Commission seeks permanent injunctions against Lucarelli,
enjoining him from engaging in the transactions, acts, practices, and courses of business

alleged in this Complaint, and disgorgement of all ill-gotten gains, including profits realized and losses avoided from the unlawful insider trading activity set forth in this Complaint, together with prejudgment interest. The Commission also seeks civil penalties against Lucarelli pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]. Finally, the Commission seeks any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1 and 78aa].

7.      Venue lies in this Court pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)], and Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1, and 78aa].  Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York and were effected, directly or indirectly, by making use of the means, instruments, or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange. During the relevant time period, Lucarelli, a resident of Manhattan, worked in IR Firm A's office in New York, New York.  Lucarelli accessed the brokerage accounts from which he perpetrated his scheme from both his office and home.  Moreover, during the time of the conduct at issue, some of the securities in which Lucarelli illicitly traded were

listed on the New York Stock Exchange (the "NYSE") or The NASDAQ Stock Market

("NASDAQ"), whose headquarters are located in the Southern District of New York.

## DEFENDANT

8.     **Lucarelli,** age 52, is a resident of New York, New York.  Starting in

August of 2012 and at all times during the relevant time period, Lucarelli was employed

as a Director of Market Intelligence at IR Firm A in Manhattan.

## RELEVANT ENTITY

9.     **IR Firm A** is an investor relations firm founded in 1984 that provides

public relations services to clients across several industry sectors in the United States by,

for example, drafting and issuing press releases on behalf of clients.  The firm has offices

in New York, Los Angeles, and San Francisco.

## CALL OPTIONS, PUT OPTIONS, AND SHORT SELLING

10.     Equity call options give the buyer the right, but not the obligation, to

purchase an agreed quantity of a company's stock at a set price (the "strike price") for a

certain period of time (through "expiration").  A buyer pays a fee, or premium, to

purchase this right.  In general, one buys a call option when the stock price is expected to

rise, or sells a call when the stock price is expected to fall.

11.     For example, in November or December of 2013, one "March 2014

$12.50" call option on PhotoMedex stock would give the purchaser the right to buy 100

shares of PhotoMedex stock for $12.50 per share before the call expired on March 22,

2014 (options generally expire on the third Friday of the expiration month).  If

PhotoMedex's stock price rose above $12.50 per share before the call option expired, the

call owner could either (i) exercise the call option and acquire the stock at $12.50 from

whoever sold him or her the call, or (ii) sell the call option, which would have increased in value.  This is so because, if the stock price rose above $12.50 per share, the call owner could purchase the stock for less than that prevailing market price by exercising the call option.  If, however, PhotoMedex's stock price failed to reach the $12.50 strike price before the call option expired and the holder had not sold the option, the call option would expire worthless.  In such circumstances, the seller of the call would keep the fee he or she obtained from selling the call, without having to sell the underlying stock to the purchaser of the call.

12.     If at the time of purchase of a call option the price at which the stock is trading is below the strike price, the call option is referred to as "out-of-the-money," because it would be unprofitable to exercise the call option and pay more for the stock than if the stock were purchased on a stock market.

13.     Equity put options give the buyer the right, but not the obligation, to sell an agreed quantity of a company's stock at a strike price through expiration.  As with call options, a buyer pays a premium to purchase this right.  In general, one buys a put option when the stock price is expected to fall, or sells a put when the stock price is expected to rise.

14.     For example, in March or April of 2014, one "May 2014 $20" put option on Aceto stock would give the purchaser the right to sell 100 shares of Aceto stock for $20 per share before the put expired on May 17, 2014.  If Aceto's stock price fell below $20 per share before the put option expired, the put owner could either (i) exercise the put option and sell the stock at $20 to whoever sold him or her the put, or sell the put option, which would have increased in value.  This is so because, if the stock price had gone

below $20 per share, the put owner could purchase the stock in the open market at the prevailing market price and then exercise the put option by selling it at the strike price for a profit. If, however, Aceto's stock price failed to reach the $20 strike price before the put option expired and the holder had not sold the option, the put would expire worthless. In such circumstances, the seller of the put would keep the fee he or she obtained from selling the put, without having to buy the underlying stock from the purchaser of the put.

15.     If at the time of purchase of a put option the strike price of that option is below the price at which the stock is then trading, the put option is referred to as "out-of-the-money," because it would be unprofitable to exercise the put option and obtain less money for the stock than if the stock were sold on a stock market.

16.     A person who sells, or "writes," an option contract is conveying to another person the right to buy (call) or sell (put) the underlying securities. A party selling a call option generally anticipates the price of the security will not increase above the strike price of the option contract. A party selling a put option generally anticipates the price of the security will not decrease below the strike price of the option contract.

17.     "Shorting" or "short selling" is the practice of selling a security that one does not own. In the normal course, the short seller borrows the securities from a third party, which he then sells to a buyer. The short seller borrows the securities with the intention of purchasing (also called "covering") the security at a later date, in order to return the securities to the third party from whom they were borrowed. A short seller stands to gain if the price of the security declines between the short sale and the purchase because the short seller has sold the security at a price that is greater than the purchase price paid to cover borrowing the security.

## FACTS

## RELEVANT ISSUERS AND ANNOUNCEMENTS

18.   ~~Aceto Corporation ("Aceto," Ticker Symbol: ACET)~~ is a New York corporation headquartered in Port Washington, New York.  At all relevant times, Aceto's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ.  The company markets, sells, and distributes products for human health, pharmaceutical ingredients, and performance chemicals. After the markets closed on May 8, 2014, Aceto announced a 30% drop in third quarter profits compared with the same quarter the previous year.  Aceto's stock opened over 9% lower the following morning, compared to the close on May 8, and fell over 17% by the time the markets closed on May 9.  IR Firm A provided services to Aceto in connection with this announcement.

19.   **CytRx Corporation ("CytRx," Ticker Symbol: CYTR)** is a Delaware corporation headquartered in Los Angeles, California.  At all relevant times, CytRx's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ.  CytRx specializes in oncology research and development and is developing a modified chemotherapeutic agent.  On the morning of December 11, 2013, CytRx announced that its potential cancer treatment had outperformed an established chemotherapy in mid-stage testing on patients with soft-tissue sarcoma.  CytRx's stock rose sharply that day to close 68% higher than its close the day before the announcement.  IR Firm A provided services to CytRx in connection with this announcement and knew of the favorable clinical trial results at least one week before they were announced to the public.

20.     **Dot Hill Systems Corp. ("Dot Hill," Ticker Symbol: HILL)** is a
Delaware corporation headquartered in Longmont, Colorado.  At all relevant times, Dot
Hill's common stock was registered with the Commission pursuant to Sections 12(b) and
12(g) of the Exchange Act and traded on the NASDAQ.  The company designs,
manufactures, and markets a range of software and hardware storage systems for the
entry and mid-range storage markets.  Before the markets opened on October 7, 2013,
Dot Hill unveiled its next-generation architecture for high-bandwidth cloud services and
vertical market storage environments.  When the markets closed on October 8, 2013, the
stock had risen almost 8% from its pre-announcement close on October 6.  Then, on the
morning of March 6, 2014, the company issued a press release stating that its expected
earnings per share ("EPS") for the first quarter of 2014 would be in the range of zero to
one cent.  When the markets opened that day, the stock had declined almost 8%
compared to its previous day's close.  According to IR Firm A's website, Dot Hill is an
IR Firm A client.

21.     **Fab Universal Corp. ("Fab," Ticker Symbol: FU)** is a Colorado
corporation headquartered in Pittsburgh, Pennsylvania.  At all relevant times, Fab's
common stock was registered with the Commission pursuant to Section 12(b) of the
Exchange Act and traded on the NYSE.  Fab sells and distributes digital media through
retail, wholesale, and kiosk channels.  On August 14, 2013, Fab announced its second
quarter earnings, revealing a third consecutive quarter of EPS growth and a 37.7%
increase in gross profit over the previous quarter.  That day the stock opened more than
8% higher than the previous day's close.  Then, before the markets opened on November
13, 2013, Fab reported strong third quarter earnings with a 15.1% increase in revenue

from the second quarter. Fab's stock opened that morning 18% higher from the previous day's close. IR Firm A provided services to Fab in connection with these two announcements.

22.    **Insmed Incorporated ("Insmed," Ticker Symbol: INSM)** is a Virginia corporation headquartered in Monmouth Junction, New Jersey. At all relevant times, Insmed's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ. Insmed is a biopharmaceutical company that develops inhaled therapies for patients battling lung diseases. After the markets closed on June 18, 2014, Insmed announced that the FDA had granted one of its drugs a favorable designation based on the company's phase two clinical trials. Insmed's stock rose almost 35% in post-market trading that evening. IR Firm A provided services to Insmed in connection with this announcement.

23.    **LCA-Vision Inc. ("LCA-Vision," Ticker Symbol: LCAV)** is a Delaware corporation headquartered in Cincinnati, Ohio. At all relevant times, LCA-Vision's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ. The company is a provider of fixed-site laser vision correction services. After the markets closed on February 13, 2014, LCA-Vision announced its upcoming sale to PhotoMedex, Inc. ("PhotoMedex") for $106 million, causing LCA-Vision's stock to rise 28% the following day. IR Firm A provided services to LCA-Vision in connection with this announcement.

24.    **Lifetime Brands, Inc. ("Lifetime," Ticker Symbol: LCUT)** is a Delaware corporation headquartered in Garden City, New York. At all relevant times, Lifetime's common stock was registered with the Commission pursuant to Section 12(b)

of the Exchange Act and traded on the NASDAQ.  Lifetime designs, sources, and sells

kitchenware, tabletop, and other products used in the home.  On May 1, 2014, Lifetime

made a pre-market announcement that its net losses had increased 483% compared to the

same period the previous year.  That day the company's stock fell more than 13% below

the price at which it had closed the previous day.  IR Firm A provided services to

Lifetime in connection with this announcement.

25.    **Pacific Ethanol, Inc. ("Pacific Ethanol," Ticker Symbol: PEIX)** is a

Delaware corporation headquartered in Sacramento, California.  At all relevant times,

Pacific Ethanol's common stock was registered with the Commission pursuant to Section

12(b) of the Exchange Act and traded on the NASDAQ.  The company produces and

markets low-carbon renewable fuels in the western United States.  At market close on

February 26, 2014, Pacific Ethanol announced record annual net sales, gross profit,

operating income, and adjusted earnings.  The following morning, Pacific Ethanol's stock

opened nearly 27% higher than the previous day's close.  Then on April 3, 2014, Pacific

Ethanol made a premarket announcement of an IPO priced at $16.00 per share.  Its stock

closed almost 9% lower than the previous day, and it continued to drop over the next two

weeks.  IR Firm A provided services to Pacific Ethanol in connection with these two

announcements.

26.    **PhotoMedex (Ticker Symbol: PHMD)** is a Nevada corporation

headquartered in Horsham, Pennsylvania.  At all relevant times, PhotoMedex's common

stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act

and traded on the NASDAQ and the Tel Aviv Stock Exchange.  PhotoMedex is a global

skin health company that provides integrated disease management and aesthetic solutions

to dermatologists, professional aestheticians, and consumers. On November 6, 2013, the company revealed a 19% drop in third quarter revenues compared to the previous year due to the loss of a key distributor. That day the stock opened nearly 13% lower than the previous day's close. Subsequently on January 2, 2014, PhotoMedex raised its revenue guidance for the fourth quarter of 2013 to reflect sales that beat analyst expectations. Its stock opened almost 9% higher than the previous day's close. IR Firm A provided services to PhotoMedex in connection with these two announcements.

27.     **Rosetta Genomics Ltd. ("Rosetta," Ticker Symbol: ROSG)** is a foreign corporation headquartered in Rehovot, Israel. At all relevant times, Rosetta's shares were registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ. The company develops and provides microRNA-based diagnostic tests. On the morning of January 13, 2014, prior to market open, Rosetta announced the signing of a master service provider agreement with an undisclosed major global biopharmaceutical company. When the markets opened that day, Rosetta's stock traded nearly 27% higher than the previous day's closing price. IR Firm A provided services to Rosetta in connection with this announcement.

28.     **Trex Company, Inc. ("Trex," Ticker Symbol: TREX)** is a Delaware corporation headquartered in Winchester, Virginia. At all relevant times, Trex's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE. The company is a manufacturer of wood-alternative decking and railing products. On August 6, 2013, Trex announced that it had missed its earnings guidance for the second quarter of 2013. On the day of the announcement, the stock opened over 8% lower than its closing price the previous day, and it eventually closed

12% lower than the previous day's closing price.  Then, on February 24, 2014, the

company announced that sales for the fourth quarter of 2013 had increased 38% from the

previous year to $63.8 million.  That day Trex's stock closed over 20% higher than the

previous day's close.  Subsequently on May 5, 2014, Trex announced lower net sales and

net income for the first quarter of 2014 than the first quarter the previous year.  That

morning, its stock opened down nearly 9% from the previous day's close.  Finally, on

August 4, 2014, Trex announced higher net sales for the second quarter of 2014

compared to the second quarter of 2013, and that it expected its revenue for the third

quarter of 2014 to be 15% higher than its net revenue for the third quarter of 2013.  Its

stock opened up over 5% from the previous day's close.  IR Firm A provided services to

Trex in connection with these four announcements.

29.  **Universal Electronics ("Universal," Ticker Symbol: UEIC)** is a

Delaware corporation headquartered in Santa Ana, California.  At all relevant times,

Universal's common stock was registered with the Commission pursuant to Section 12(b)

of the Exchange Act and traded on the NASDAQ.  Universal develops control technology

solutions and manufactures a broad line of pre-programmed universal remote control

products, embedded hardware and software, and audio-video accessories.  At market

close on February 20, 2014, Universal reported 16% year-over-year revenue growth for

the fourth quarter of 2013.  Its stock increased in post-market trading and opened up 6%

the following morning compared to the previous day's close.  Then, after the markets

closed on May 1, 2014, Universal announced a 13% increase in net sales and 38%

increase in operating income compared to the first quarter the previous year.  Universal's

stock closed nearly 12% higher the next day.  IR Firm A provided services to Universal
in connection with these two announcements.

30.    ~~USA Truck, Inc. ("USA Truck," Ticker Symbol: USAK)~~ is a Delaware
corporation headquartered in Van Buren, Arkansas.  At all relevant times, USA Truck's
common stock was registered with the Commission pursuant to Section 12(b) of the
Exchange Act and traded on the NASDAQ.  USA Truck is a transportation and logistics
provider that transports commodities throughout the continental United States, as well as
through portions of Canada and Mexico.  Prior to market open on February 11, 2014,
USA Truck disclosed an approximately $1.5 million loss from litigation costs as well as
an upward adjustment to its long-term claims liability reserve.  That day its stock closed
over 5% lower than the close the previous day.  IR Firm A provided services to USA
Truck in connection with this announcement.

**LUCARELLI'S INSIDER TRADING**

**A.    <u>Lucarelli's Investor Relations Background</u>**

31.    Lucarelli has worked in investor relations since at least 2004.  From 2004
through August 2012, he worked at an investor relations firm, IR Firm B.

32.    In August 2012, Lucarelli began working at IR Firm A.  According to IR
Firm A's website, the firm is a "leading provider of investor relations services."

33.    On August 16, 2012, in connection with an offer of employment to
Lucarelli, IR Firm A e-mailed Lucarelli copies of IR Firm A's Code of Conduct (the
"Code of Conduct") that stated:  "All employees at [IR Firm A] are generally aware of
the issue of insider information and its illegal use to garner stock market trading profits."
The Code of Conduct also provides that it is IR Firm A policy that "[n]o one connected to

[IR Firm A] may, directly or indirectly trade in any security issued by a client of [IR Firm A]," or may engage in short sales of client securities or trade in options "in which the underlying security is that of a client of IR Firm A."

34.     The August 16, 2012, e-mail from IR Firm A to Lucarelli also attached IR Firm A's Confidentiality and Non-Solicitation Agreement, which, among other things, required employees to agree "that during [their] employment and thereafter [they] will not disclose to anyone or use any [client] confidential information for [his or her] own benefit or the benefit of others."

35.     Lucarelli responded to this email the same day, stating that he "look[ed] forward to this opportunity while adhering to all [IR Firm A] policies."  IR Firm A's website lists Lucarelli as a "Director of Market Intelligence," and states that he works on "investor relations outreach and stock market intelligence for domestic and international clients."

36.     Lucarelli kept a copy of the Code of Conduct on his work computer.

37.     As an investor relations adviser, IR Firm A obtained material, nonpublic information regarding the corporate announcements of the clients it advises, in advance of that information being released to the general public.

38.     IR Firm A owes a duty of confidentiality to, among others, its clients, including the obligation to maintain the confidentiality of information obtained by, or provided to, the firm in connection with engagements.  Indeed, it is standard practice for IR Firm A to sign non-disclosure agreements ("NDAs") with its clients, outlining IR Firm A's and its employees' duties of confidentiality with respect to the information they obtain from clients.

39.     Lucarelli's principal role at IR Firm A was to develop new client relationships for IR Firm A.  In this role, Lucarelli was not tasked with reviewing drafts of client press releases before they were made public by the client.  Lucarelli also knew or should have known that it was standard practice for IR Firm A to sign NDAs with prospective clients.

40.     As an employee of IR Firm A, Lucarelli had access, including electronic access, to material nonpublic information provided to IR Firm A by its clients in advance of the public issuance of press releases that IR Firm A prepared for those clients.

41.     As an employee of an investor relations firm for at least 10 years, and because he received IR Firm A's policies limiting trading on the securities of IR Firm A's clients by firm employees prior to starting to work at IR Firm A, Lucarelli knew or should have known that he had an obligation to his employer and/or to his employer's clients not to trade based on material nonpublic information that he may have obtained because of his employment.  Moreover, he owed a duty or obligation arising from his relationship of trust and confidence to his employer and its clients to keep confidential all nonpublic information.

**B.      Lucarelli's Brokerage Accounts**

42.     On January 18, 2008, Lucarelli opened a brokerage account at TradeKing (the "First TradeKing Account").  In the account opening documents, Lucarelli stated that he was a "self-employed consultant."  At the time, however, Lucarelli was employed at IR Firm B.

43.     On November 21, 2013, Lucarelli submitted a new margin account opening application with TradeKing (the "Second TradeKing Account").  In this

application, Lucarelli stated his employment status as "self/retired consultant." At the time, however, Lucarelli was employed at IR Firm A. In fact, Lucarelli's application for the Second TradeKing Account was faxed from IR Firm A.

44.     In March 2014, TradeKing terminated its relationship with Lucarelli. In connection with closing the First and Second TradeKing Accounts, Lucarelli transferred approximately $600,000 to a checking account in his name at a bank in the United States (the "checking account").

45.     On March 24, 2014, Lucarelli opened a new brokerage account with Fidelity Investments ("Fidelity") (the "Fidelity Account"). As he had done in connection with the TradeKing accounts, Lucarelli stated in the account opening documents that he was a self-employed consultant. However, at the time Lucarelli was an employee of IR Firm A. In connection with opening the Fidelity Account, Lucarelli wired $600,000 from the checking account to Fidelity.

46.     Less than two weeks later, on or around June 3, 2014, Fidelity terminated its relationship with Lucarelli. Lucarelli then transferred over $550,000 from the Fidelity Account to the checking account.

47.     On or around June 5, 2014, Lucarelli opened a new brokerage account with OptionsXpress, an affiliate of Charles Schwab, and funded it with $510,000 on June 11 from the checking account. The account opening documents state that Lucarelli is retired, although at the time he worked at IR Firm A. The account opening documents also contained other false information.[1]

---

[1]     On March 18, 2014, Lucarelli prepared, but did not have processed, an application to open an account with another brokerage firm, falsely stating in the account opening

**C.    Lucarelli's Trading in the Securities of IR Firm A's Clients**

48.    During the relevant time period, on at least twenty-one separate occasions, Lucarelli unlawfully traded in IR Firm A's clients' securities based upon material, nonpublic information.  These trades are summarized in Table 1, below.

49.    Lucarelli reaped over $950,000 in profits from these illegal trades.

50.    The circumstances of certain representative trades are set forth below. Common to each trade summarized in Table 1, however, are the following:  (1) IR Firm A served as an adviser to the company announcing its earnings or other significant corporate event, such as a merger or clinical drug trial result; (2) Lucarelli was employed by IR Firm A in the days and weeks preceding, and at the time of the announcements and the trades; (3) upon information and belief, Lucarelli obtained access to material, nonpublic information related to IR Firm A's clients in the days preceding his trades in securities associated with those clients; (4) Lucarelli began taking a position in IR Firm A's clients' securities in the days immediately preceding the announcement (although in a few instances he began his purchases weeks in advance of the announcement); (5) Lucarelli began divesting himself of any given position immediately after a significant corporate announcement; and (6) Lucarelli profited from these trades.

---

documents that he was self-employed.  On or around June 5, 2014, Lucarelli opened a brokerage account with yet another firm, falsely stating in the application that for the past ten years he had worked as the president of a firm bearing his first and last names.  This account was closed by the brokerage firm on or around June 13, 2014.

a.     **Trading in the Securities of Trex Ahead of Earnings Announcements**

*Trading in August 2013*

51.     On Friday, August 2, 2013, Lucarelli sold short 2,400 shares of Trex out of the First TradeKing Account.  The following Monday, August 5, immediately before the markets closed, Lucarelli shorted an additional 150 shares out of the same account, for a total short position of 2,550 shares.  Lucarelli shorted these shares at prices ranging from $48.80 to $51.65 per share.

52.     On Tuesday, August 6, 2013, at 7:30 a.m.,[2] Trex issued a press release announcing its financial results for the second quarter of 2013.  The press release listed a senior vice president of IR Firm A as one of the investor contact persons.

53.     The pre-market press release explained that Trex's net sales and net income for the second quarter of 2013 were higher than those for the same quarter in 2012.  Still, the company had missed its earnings guidance for the second quarter of 2013.  The press release also stated that the company expected net sales for the third quarter of 2013 to come in at approximately $72 million.  This was approximately 10% lower than analysts' expectations of $79.9 million.

54.     Trex's stock opened down more than 8%, and eventually closed 12% lower than its previous day's closing price on August 5.

55.     By 11 a.m. on August 6, Lucarelli purchased a total of 2,550 shares of Trex in his First TradeKing account, sufficient to cover the short position he had acquired in the preceding two trading days.  Because the stock price had decreased, Lucarelli

---

[2]     Unless otherwise noted, all times stated in this Complaint refer to Eastern Time.

covered his short positions at a profit.  Specifically, he purchased the shares to cover his short position at prices ranging from $44.00 to $45.32 per share.

56.    As a result of these transactions, Lucarelli reaped nearly $15,000 in illicit profits.

57.    The August 5 and 6, 2013 transactions in Trex stock were executed in Lucarelli's First TradeKing Account from a computer bearing an IP Address associated with IR Firm A ("IR Firm A IP Address").

*Trading in January/February 2014*

58.    A few months later, Lucarelli purchased 200 call option contracts on Trex (comprised of 150 contracts on January 27, 2014, and an additional 50 contracts on February 10, 2014) in the Second TradeKing Account.

59.    The orders for these calls were placed from a computer bearing the IR Firm A IP Address.

60.    These contracts, with a strike price of $75 and an expiration date of April 19, 2014, cost Lucarelli between $1.55 and $2.40 per contract option.  At the times of these purchases, Trex stock traded between $62.09 and $70.54 per share, meaning that the call options were out-of-the-money.

61.    Starting on February 19, 2014, Lucarelli made purchases of Trex's stock. By the end of the day on Friday, February 21, 2014, Lucarelli had purchased 6,900 shares of the stock, at prices ranging from $67.20 to $68.49 per share.

62.    The orders were placed from a computer bearing the IR Firm A IP Address.

63.     At 7:30 a.m. on Monday, February 24, 2014, Trex issued a press release regarding its earnings for the fourth quarter of 2013.  The press release listed a senior vice president of IR Firm A as one of the investor contact persons.

64.     In the pre-market press release, Trex announced earnings of $0.23 per share for the fourth quarter of 2013.  Financial analysts had expected the company to announce EPS of only $0.16.

65.     Trex's stock increased immediately, opening at $75 per share after closing at $68.40 the previous business day and reaching as high as $86.85 per share that day.

66.     Lucarelli sold his call options and the shares of Trex that morning. Lucarelli sold the shares at prices ranging from $72.40 to $80.27 per share.  He sold the calls at prices ranging from $4.40 to as high as $7.40 per contract.

67.     The orders were placed from a computer bearing an IR Firm A IP Address.

68.     Lucarelli reaped more than $81,000 in illicit profits from the call option transactions and over $53,000 in illicit profits from the Trex stock transactions.

*Trading in April/May 2014*

69.     On April 23, 2014, and now trading out of the Fidelity Account, Lucarelli began buying Trex put option contracts.

70.     Between April 23 and May 2, Lucarelli purchased 201 put contracts with a $70 strike price which were set to expire on June 21, 2014.  Lucarelli paid between $2.06 and $2.58 per contract.

71.     Between April 24 and May 2, Lucarelli also purchased 55 put contracts with a $75 strike price and the same expiration of June 21, 2014.  Lucarelli paid between $3.30 and $3.80 per contract.

72.     During this time, Trex shares were priced between $77.75 and $80.12 per share, which means that the put contracts purchased were all out-of-the-money.

73.     Between May 1 and 2, 2014, Lucarelli also sold short 8,500 shares of Trex at prices ranging from $77.91 to $80.99 per share.

74.     The following Monday, May 5, 2014, at 7:30 a.m., Trex issued a press release explaining that its sales and net income for the first quarter of 2014 had decreased due to the colder-than-normal conditions across the country.  The press release listed a senior vice president of IR Firm A as one of the investor contact persons.

75.     Trex's stock, which had closed at $79.41 per share the previous day, hit an intra-day low of $69.00 per share on May 5.

76.     By the end of that morning Lucarelli sold all the put options and covered his short position in the Trex stock.

77.     Lucarelli sold the $70-strike puts, which had increased in value as the market expected Trex stock to drop, at prices ranging from $2.00 to $3.27 per contract, for an illicit profit of more than $7,800.

78.     Lucarelli sold the $75-strike puts, which had similarly increased in value, at prices ranging from $4.20 to $5.37 per contract, for an illicit profit of approximately $6,800.

79.     Lucarelli purchased Trex stock to cover his short position between $71.10 and $75.50 per share, for an illicit profit of approximately $39,600.

80.     At least some of these transactions in Trex stock were placed from a computer bearing an IR Firm A IP Address.

81.     In all, Lucarelli reaped more than $54,000 in illicit profits from the April/May 2014 transactions in Trex stock and options.

*Trading in July/August 2014*

82.     As of July 24, 2014, Lucarelli had in his possession an undated draft of a press release in which Trex planned to announce earnings for the second quarter of 2014.

83.     The draft press release, which IR Firm A helped write, was scheduled to be issued on August 4, 2014, and reported that Trex's net sales were up 30% from the same quarter last year.  The press release also explained that Trex expected earnings for the third quarter of 2014 to be 15% higher than those for the same quarter in 2013.

84.     Between Friday, July 25, 2014 and the following Friday, August 1, 2014, Lucarelli purchased a net total of 37,400 shares of Trex.  All of these shares were purchased in the $28.00 range.

85.     On Monday, August 4, 2014, Trex issued a press release materially identical to the one Lucarelli had in his possession on July 24, stating that its net sales were up 30% from the same quarter last year and that it expected earnings for the third quarter of 2014 to be 15% higher than those for the same quarter in 2013.  Trex's stock, which had closed at $28.67 on August 1, 2014, opened at $30.17, up more than 5%, that morning.

86.     On August 4, 2014, Lucarelli sold over 35,000 of the shares of Trex he had recently purchased.  These sales occurred at prices ranging from $29.99 to $31.80.

87.     As a result of these illicit trades, Lucarelli made over $89,000 in profits.

b.      **Trading in the Securities of Fab Ahead of Earnings Announcements**

_Trading in August 2013_

88.     Between August 6 and August 13, 2013, Lucarelli purchased a total of 42,000 shares of Fab in the First TradeKing Account, at prices ranging from $3.98 to $4.48 per share.  His final trade was made at 3:58 p.m. on August 13, 2013, immediately before the market closed.

89.     On Wednesday, August 14, 2013, at 7:30 a.m., Fab issued a press release announcing its financial results for the second quarter of 2013.  The press release listed two individuals from IR Firm A—one a managing director and the other a vice president—as the investor contact persons.

90.     In the pre-market press release, Fab explained that it had achieved strong growth in profit and revenue in the quarter.

91.     Fab's stock opened at $4.85 per share that day, and eventually closed at $4.75 per share, an increase of approximately 10% from the prior day's close.

92.     By the end of that morning Lucarelli sold his entire position in the shares of Fab, selling his shares in prices ranging from $4.75 to $4.95 per share.

93.     Lucarelli reaped more than $25,000 in illicit profits from these transactions in Fab stock.

94.     The orders for the foregoing transactions in Fab stock were placed from a computer bearing an IR Firm A IP Address.

*Trading in November 2013*

95.     On the afternoon of November 12, 2013, Lucarelli purchased 27,000 shares of Fab in his First TradeKing Account.  Most of these purchases were executed at between $5.80 and $5.90 a share.

96.     The following morning, on November 13, 2013, at 8:00 a.m., Fab released its earnings for the third quarter of 2013, disclosing an additional growth in revenue of 15.1% over the previous quarter.  The press release listed two individuals from IR Firm A—one a managing director and the other a vice president—as the investor contact persons.

97.     Fab's stock reached a high of $7.39 per share in intra-day trading.

98.     Just minutes after the press release was issued, Lucarelli began selling his Fab shares, and by 8:24 a.m., he had told his entire holdings for a profit of over $20,000.

99.     The orders for the foregoing transactions in Fab stock were placed from a computer bearing an IR Firm A IP Address.

**c.     Trading in the Securities of LCA-Vision Ahead of its Acquisition**

100.     Starting in at least mid-2013, LCA-Vision and PhotoMedex began discussions regarding a potential acquisition of LCA-Vision by PhotoMedex.

101.     By January 13, 2014, at the latest, individuals at IR Firm A were made aware of the merger discussions between LCA-Vision and PhotoMedex.

102.     On Monday, February 10, 2014, LCA-Vision and PhotoMedex finalized the text of their merger agreement.

103.     On the morning of Thursday, February 13, 2014, the boards of both companies met to approve the merger agreement.

104.    On that same morning Lucarelli began purchasing LCA-Vision stock.  By the afternoon he had purchased 44,921 shares of LCA-Vision.  Most purchases were made at prices ranging from $4.00 to $4.34 per share.

105.    After the close of the markets on February 13, 2014, LCA-Vision and PhotoMedex announced the acquisition of LCA-Vision by PhotoMedex.  The press release listed two IR Firm A employees—one a managing director and the other a senior vice president—among the contacts for investors.

106.    On the following morning, Friday, February 14, 2014, LCA-Vision stock was up over $1, or more than 23%, from its previous close of $4.30 per share.

107.    Lucarelli began selling his shares at 9:25 a.m. that morning.  By two business days later, on February 19, 2014, Lucarelli had sold his entire position.  He sold most shares at prices ranging from $5.36 to $5.59 per share.  As a result of these trades, Lucarelli reaped illicit profits of more than $57,000.

108.    The orders for the foregoing transactions were placed from a computer bearing an IR Firm A IP Address.

**d.    Trading in the Securities of Aceto Ahead of Earnings Announcement**

109.    In late April 2014, trading out of his Fidelity Account, Lucarelli entered into a series of transactions designed to profit from a decrease in the price of the stock of Aceto.

110.    On Wednesday, April 16, 2014, Aceto sent a draft of its financial earnings for the third quarter of 2013 to IR Firm A.

111.    Starting on Friday, April 25, and over the course of the following two weeks, Lucarelli purchased 280 put option contracts on Aceto stock, with a $22.50 strike price and an expiration date of May 16, 2014.

112.    During this time Lucarelli also purchased 154 put options with a $20 strike price and the same expiration date.

113.    In addition, starting on Monday, May 5, 2014, Lucarelli purchased 65 put options, with a $20 strike, and 179 put options with a $22.50 strike, both set to expire on June 20, 2014.

114.    Finally, on Thursday, May 8, 2014, Lucarelli shorted over 33,000 shares of Aceto.  During all these times, the price of Aceto stock hovered around $23 per share.

115.    After the markets closed on May 8, Aceto issued a press release announcing that its third quarter results for the fiscal year were lower than the results for the same quarter during the prior year.  The press release listed a managing director of IR Firm A as a contact person for investors.

116.    By 10 a.m. the following day, Lucarelli had sold all of his put options and covered his short position in Aceto stock.  Lucarelli reaped over $201,000 in illicit profits from his Aceto trading.

117.    At least some of these transactions in Aceto stock were placed from a computer bearing an IR Firm A IP Address.

118.    The following table summarizes Lucarelli's illicit trades based upon material, nonpublic information contained in as-yet unissued press releases relating to material corporate event announcements made by IR Firm A clients.

**Table 1 – Summary of Trading by Lucarelli Ahead of IR FIRM A Client Announcements**

| Ticker/ Security Traded | Issuer | Date of First Trade | Type of Trade | No. of Securities Traded | Date & Time of Announcement | Date of Position Close out | Profits |
|---|---|---|---|---|---|---|---|
| TREX/ Stock | Trex | 8/2/13 | Short sale | 2,550 | 8/6/13 (7:30 a.m.) | 8/6/13 | $14,979.85 |
| FU/ Stock | Fab | 8/6/13 | Buy | 42,000 | 8/14/13 (7:30 a.m.) | 8/14/13 | $25,528.04 |
| HILL/ Stock | Dot Hill | 9/13/13 | Buy | 5,000 | 10/7/13 (8:00 a.m.) | 10/8/13 | $2,410.00 |
| PHMD/ Stock | PhotoMedex | 11/4/13 | Short sale | 9,300 | 11/6/13 (6:30 a.m.) | 11/6/13 | $13,471.57 |
| FU/ Stock | Fab | 11/12/13 | Buy | 27,000 | 11/13/13 (8:00 a.m.) | 11/13/13 | $20,324.41 |
| CYTR/ Stock | CytRx | 12/9/13 | Buy | 19,000 | 12/11/13 (8:00 a.m.) | 12/12/13 | $5,330.04 |
| PHMD/ $12.50, Mar. 2014 Call Options | PhotoMedex | 12/26/13 | Buy | 100 | 1/2/14 (8:30 a.m.) | 1/2/14 | $5,260.00 |
| PHMD/ Stock | PhotoMedex | 12/26/13 | Buy | 11,500 | 1/2/14 (8:30 a.m.) | 1/3/14 | $15,023.00 |
| ROSG/ Stock | Rosetta | 1/9/14 | Buy | 53,300 | 1/13/14 (8:00 a.m.) | 1/13/14 | $36,381.44 |
| USAK | USA Truck | 2/6/14 | Short sale | 12,584 | 2/11/14 (7:01 a.m.) | 2/11/14 | $2,184.66 |
| LCAV/ Stock | LCA-Vision | 2/13/14 | Buy | 44,921 | 2/13/14 (4:10 p.m.) | 2/19/14 | $57,444.43 |

**Table 1 – Summary of Trading by Lucarelli Ahead of IR FIRM A Client Announcements**

| Ticker/ Security Traded | Issuer | Date of First Trade | Type of Trade | No. of Securities Traded | Date & Time of Announcement | Date of Position Close out | Profits |
|---|---|---|---|---|---|---|---|
| UEIC/ Stock | Universal | 2/20/14 | Buy | 2,000 | 2/20/14 (4:05 p.m.) | 2/20/14 | $2,205.25 |
| TREX/ Stock | Trex | 2/19/14 | Buy | 6,900 | 2/24/14 (7:30 a.m.) | 2/24/14 | $53,185.31 |
| TREX/ $75, Apr. 2014 Call Options | Trex | 1/27/14 | Buy | 200 | 2/24/14 (7:30 a.m.) | 2/24/14 | $81,210.00 |
| PEIX/ Stock | Pacific Ethanol | 2/25/14 | Buy | 51,771 | 2/26/14 (4:05 p.m.) | 2/27/14 | $85,509.85 |
| HILL/ Stock | Dot Hill | 3/5/14 | Short sale | 63,420 | 3/6/14 (9:00 a.m.) | 3/6/14 | $54,730.93 |
| PEIX/ $15, Apr. 2014 Call Options | Pacific Ethanol | 3/26/14 | Sale | 105 | 4/3/14 (8:30 a.m.) | N/A | $9,689.43 |
| LCUT/ Stock | Lifetime | 4/28/14 | Short sale | 25,600 | 5/1/14 (7:01 a.m.) | 5/1/14 | $63,597.69 |
| UEIC/ Stock | Universal | 4/25/14 | Buy | 7,000 | 5/1/14 (4:05 p.m.) | 5/2/14 | $10,802.20 |
| TREX/ Stock | Trex | 5/1/14 | Short sale | 8,500 | 5/5/14 (7:30 a.m.) | 5/5/14 | $39,673.24 |
| TREX/ $70, June 2014 Put Options | Trex | 4/23/14 | Buy | 201 | 5/5/14 (7:30 a.m.) | 5/5/14 | $7,858.26 |
| TREX/ $75, June 2014 Put Options | Trex | 4/24/14 | Buy | 55 | 5/5/14 (7:30 a.m.) | 5/5/14 | $6,804.54 |

**Table 1 – Summary of Trading by Lucarelli Ahead of IR FIRM A Client Announcements**

| Ticker/ Security Traded | Issuer | Date of First Trade | Type of Trade | No. of Securities Traded | Date & Time of Announce-ment | Date of Position Close out | Profits |
|---|---|---|---|---|---|---|---|
| ACET/ $22.50, May 2014 Put Options | Aceto | 4/25/14 | Buy | 280 | 5/8/14 (6:21 p.m.) | 5/9/14 | $49,780.79 |
| ACET/ $20, May 2014 Put Options | Aceto | 4/30/14 | Buy | 154 | 5/8/14 (6:21 p.m.) | 5/9/14 | $5,290.35 |
| ACET/ $20, June 2014 Put Options | Aceto | 5/5/14 | Buy | 65 | 5/8/14 (6:21 p.m.) | 5/9/14 | $4,400.14 |
| ACET/ $22.50, June 2014 Put Options | Aceto | 5/5/14 | Buy | 179 | 5/8/14 (6:21 p.m.) | 5/9/14 | $32,822.66 |
| ACET/ Stock | Aceto | 5/8/14 | Short sale | 33,145 | 5/8/14 (6:21 p.m.) | 5/9/14 | $109,126.82 |
| INSM/ Stock | Insmed | 6/12/14 | Buy | 41,100 | 6/18/14 (4:30 p.m.) | 6/20/14 | $21,666.75 |
| INSM/ $12.50, June 2014 Call Options | Insmed | 6/12/14 | Sale | 211 | 6/18/14 (4:30 p.m.) | 6/20/14 | $9,490.40 |
| INSM/ $14, June 2014 Call Options | Insmed | 6/12/14 | Sale | 200 | 6/18/14 (4:30 p.m.) | 6/20/14 | $19,852.54 |
| TREX/ Stock | Trex | 7/25/14 | Buy | 40,800 | 8/4/14 (7:30 a.m. approx.) | 8/4/14 | $89,487.03 |
| TOTAL | | | | | | | $955,521.62 |

## CLAIMS FOR RELIEF

## CLAIM I
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

119.    The Commission realleges and incorporates by reference paragraphs 1 through 118, as though fully set forth herein.

120.    At the time of each illegal trade identified herein, the relevant information was nonpublic, and held by IR Firm A as confidential information related to client representations.

121.    In addition, the information was, in each case, considered confidential by the IR Firm A client which was the source of the information, and which had policies protecting confidential information, as well as by IR Firm A itself.

122.    In each instance, the information was material – it would have been important to a reasonable investor in making his or her investment decision.  There was a substantial likelihood that the disclosure of the misappropriated information would have been viewed by a reasonable investor as having significantly altered the total mix of information available to investors.

123.    In each case, defendant Lucarelli traded in his accounts while in possession of the material nonpublic information, which he had obtained in violation of the duties that he owed to Investor Relations Firm A and/or its clients.

124.    In each instance, defendant Lucarelli knew, recklessly disregarded, or should have known, that IR Firm A owed to each of its clients a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to keep the information confidential.

125.    By virtue of the foregoing, and with respect to his trading in advance of each corporate announcement described above, defendant Lucarelli, with scienter, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

126.    By virtue of the foregoing, defendant Lucarelli, directly or indirectly, violated, and, unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## CLAIM II
### Violations of Section 17(a) of the Securities Act

127.    The Commission realleges and incorporates by reference paragraphs 1 through 118, as though fully set forth herein.

128.    By virtue of the foregoing, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, defendant Lucarelli, with scienter:  (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon a purchaser.

129.    By reason of the conduct described above, defendant Lucarelli directly or indirectly violated, and, unless enjoined, will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## CLAIM III
### Violations of Section 14(e) of the Exchange Act and Rule 14e-3 thereunder

130.    The Commission realleges and incorporates by reference paragraphs 1 through 118, as though fully set forth herein.

131.    Prior to the public announcement of the tender offer for LCA-Vision by PhotoMedex, and after a substantial step or steps to commence such tender offer had been taken, defendant Lucarelli, while in possession of material nonpublic information relating to the tender offer, which information he knew or had reason to know was nonpublic and had been acquired directly or indirectly from the offering company, the issuer, or any officer, director, partner, or employee, or other person acting on behalf of the offering company or issuer, purchased securities of LCA-Vision.

132.    By reason of the conduct described above, defendant Lucarelli directly or indirectly violated, and, unless enjoined, will again violate, Section 14(e) of the Exchange Act [15 U.S.C. §78n] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## <u>RELIEF SOUGHT</u>

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining defendant Lucarelli from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

32

**II.**

Permanently restraining and enjoining defendant Lucarelli from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

**III.**

Permanently restraining and enjoining defendant Lucarelli from violating Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)], and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3];

**IV.**

Ordering defendant Lucarelli to disgorge with prejudgment interest, all ill-gotten gains received as a result of the conduct alleged in this Complaint, including the illicit trading profits, other ill-gotten gains, and/or losses avoided;

**V.**

Ordering defendant Lucarelli to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

**VI.**

Granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       August 26, 2014



Sanjay Wadhwa
Andrew M. Calamari
Alexander Vasilescu
Lara S. Mehraban
Jorge G. Tenreiro
New York Regional Office
SECURITIES AND EXCHANGE
  COMMISSION
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-9145 (Tenreiro)
Attorneys for the Plaintiff